IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| KENNETH MICHAEL BROWN,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:20-CV-01742-JGC<br><br>JUDGE JAMES G. CARR<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>REPORT AND RECOMMENDATION |

INTRODUCTION

Plaintiff Kenneth Michael Brown filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 7, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a report and recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Brown filed for DIB on July 12, 2018, alleging a disability onset date of December 1, 2015. (Tr. 238). His claims were denied initially and upon reconsideration. (Tr. 142-52, 154-67).

1

He then requested a hearing before an administrative law judge. (Tr. 176-77). Mr. Brown (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 23, 2019. (Tr. 114-141). On August 28, 2019, the ALJ found Mr. Brown not disabled in a written decision. (Tr. 20-42). The Appeals Council denied Mr. Brown's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Mr. Brown timely filed this action on August 7, 2020. (ECF #1).

### FACTUAL BACKGROUND

I. ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Brown's and VE Kathleen Reis, presented during the hearing before the ALJ.

Mr. Brown's alleged disability onset date is December 1, 2015, when he first underwent surgery - a discectomy and laminectomy. (Tr. 124). His pain was worse after the surgery. (*Id.*). Mr. Brown had a second back surgery and was scheduled for an additional back surgery post-dating the administrative hearing. (Tr. 125). Mr. Brown first began to experience back pain the day after he helped his grandfather move railroad ties. (Tr. 126). He did not feel pain immediately afterward but was unable to get out of bed the next morning. (*Id.*). He was diagnosed with ankylosing spondylitis, depression, and somatic symptom disorder. (Tr. 127).

Neither injections nor nerve blocks were helpful. (Tr. 126). The surgeries relieved some pressure but "it's still very there." (*Id.*). Mr. Brown described the pain as throbbing, stabbing, and shooting into his leg and foot. (*Id.*). He analogized the pain to the pressure felt when pushing on a loose tooth, but constant. (*Id.*). To manage the pain, Mr. Brown uses medication, which takes the edge off. (Tr. 127).

Mr. Brown testified he has a driver's license and currently drives, but experiences pain from the uncomfortable sitting position and his foot falls asleep. (Tr. 119-20). He is a high school graduate and works about fifteen hours a week at Alger Carry Out. (Tr. 120). At the time of the hearing, Mr. Brown had been with Alger Carry Out for about four years. (*Id.*). Mr. Brown's employer offers him many accommodations that allow him to work. (Tr. 121). The heaviest item Mr. Brown must lift is a gallon of milk, he does not work on "order days," takes as many breaks as he wants, and, because his workspace is at waist-level, he does not have to do any bending, lifting, or twisting. (*Id.*). When Mr. Brown has to take a break due to pain, he walks a lap around the carry-out's parking lot or sits in his truck and uses a chair massager with heat and vibration. (Tr. 134). He also brings his TENS unit to use during breaks. (*Id.*).

Mr. Brown's past work includes concrete leveling and stick-welding with High Welding, Inc. and semitrailer and truck washing at Blue Beacon USA. (Tr. 122-24). He estimates the heaviest items he lifted at each job were thirty pounds and ten pounds, respectively. (Tr. 123, 124).

Mr. Brown estimates he can walk for fifteen minutes, or about halfway around the block, before needing to rest, can sit for five minutes before needing to change positions, and can comfortably lift ten pounds. (Tr. 126-27). Using his shoulders over the course of the day aggravates his back pain. (Tr. 133).

At the time of the hearing, Mr. Brown had been taking medications to manage his mental health impairments for about three years. (Tr. 127). He had recently seen a pain psychologist on his surgeon's recommendation. (Tr. 128). Mr. Brown has issues with short term memory and concentration because the pain distracts him, causing him to be off task. (*Id.*).

Mr. Brown's typical day begins with letting his small dog outside while he makes toast and takes his pills. (Tr. 128). His pain is worst in the morning. (Tr. 128-29). Mr. Brown immediately gets into a hot shower to try to loosen up and let the medicine kick in. (Tr. 128). After his shower, Mr. Brown uses ice or a TENS unit for pain control. (*Id.*). He then takes a muscle relaxer, which usually causes him to fall asleep. (Tr. 129). When he lays back down, Mr. Brown sets an alarm because if he lays down for too long, it starts the pain process over again. (*Id.*). At least one day a week, Mr. Brown's pain is worse than other days and he stays in the clothes in which he slept. (Tr. 132). Mr. Brown often sleeps in a recliner because lying flat causes a pinching pain. (*Id.*). He spends about four hours a day in the recliner. (*Id.*).

At the time of the hearing, Mr. Brown had recently broken his left foot after a fall. (Tr. 129). His doctor put him in an air cast walking boot rather than a cast with crutches because the cast would put too much strain on Mr. Brown's back. (*Id.*). He estimates he falls about three to four times a year, usually while navigating steps. (Tr. 130). His falls occur when he sits too long and his foot falls asleep, which his doctor calls "drop foot." (*Id.*).

The VE then testified. The ALJ proposed the following hypothetical individual and asked if such an individual could perform Mr. Brown's past relevant work: an individual of Mr. Brown's age, education, and vocational profile, with a residual functional capacity to perform light work, except he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; can never work around hazards such as unprotected heights or moving mechanical parts; cannot operate bilateral foot controls; and should avoid working in extreme heat, cold, humidity, or wetness. (Tr. 137). The VE testified such an individual could work as a stocker as actually performed, not as generally performed. (*Id.*). The VE also

4

identified other positions that such an individual could perform, including a merchandise marker, a cashier II, and a mailroom clerk. (Tr. 137-38). Under the same hypothetical conditions, but limited to simple tasks and infrequent changes in a routine work setting, and restricted from production rate pace work, an individual would not be able to perform the stocker position, but would be able to perform the other identified positions. (Tr. 138).

Under the original hypothetical, but with a sedentary exertional level, the hypothetical individual would not be able to perform Mr. Brown's past relevant work but could perform work as a food and beverage order clerk, a charge account clerk, and a document preparer. (*Id.*). Under the same hypothetical conditions, but limited to simple tasks and infrequent changes in a routine work setting, and restricted from production rate pace work, an individual could still perform the other identified positions. (Tr. 139).

The VE also testified to an employer's tolerances. An employer tolerates up to 15% off-task time and one absence per month. (Tr. 140). A typical workday consists of one fifteen-minute break in the morning, a lunch break lasting thirty minutes or one hour, and one fifteen-minute afternoon break. (Tr. 139).

II.  **PERSONAL AND VOCATIONAL EVIDENCE**

Mr. Brown was 31 years old at the time of his alleged disability onset date, and 35 years old at the time of the administrative hearing. (Tr. 118). Mr. Brown completed 12th grade. (Tr. 120). In the past, Mr. Brown has been employed as a stocker (classified heavy exertion but performed as light), a construction worker II and arc welder, and a truck washer. (Tr. 135-36).

### III.     RELEVANT MEDICAL EVIDENCE

On June 18, 2015, Mr. Brown saw Lynn Jedlicka, M.D., and complained of pain in his back that started the previous summer when he helped moved railroad ties into a truck. (Tr. 347). Mr. Brown endorsed nearly constant pain in his left lower back and upper buttock, which worsened with sitting on his wallet. (*Id.*). He noted the pain was the worst in the morning and described it as annoying, like a toothache, but felt better when he supported his back with pressure. (*Id.*). Mr. Brown also noted numbness and pain in his left anterior thigh when sitting with his legs crossed. (*Id.*). He had some pain relief when lying down with his knees turned one way and his upper body twisted in the opposite direction. (*Id.*).

Dr. Jedlicka noted the conservative treatments Mr. Brown underwent without relief from his symptoms, including medication management, chiropractic care, and two rounds of physical therapy. (Tr. 348). She also reviewed Mr. Brown's lumbar MRI, dated May 29, 2015, which showed anterior spondylosis at L1-L2, facet arthropathy at L2-L4, mild canal stenosis at L2-L5, bilateral foraminal stenosis at L4-S1, and a left paracentral herniated nucleus pulposus at L5-S1 that compressed the left S1 nerve root. (*Id.*). On physical exam, the doctor noted no notable erythema or swelling along the spine but did detect straightened lordosis. (Tr. 349). Mr. Brown exhibited slightly brisk deep tendon reflexes in the upper and lower extremities and positive facet loading on the left side, but was otherwise normal on examination. (*Id.*).

Mr. Brown attended an evaluation with Blanchard Valley Pain Management on July 28, 2015. (Tr. 447). Physical examination revealed positive straight leg test bilaterally, with tenderness on palpation to the lumbosacral spine and paraspinal musculature. (Tr. 448). Mr. Brown exhibited normal motor strength and symmetric bilateral reflexes. (*Id.*). On August 27 and September 10,

6

2015, Mr. Brown returned to Blanchard Valley Pain Management for lumbar epidural steroid injections at the L5-S1 level. (Tr. 449-50). Mr. Brown followed up with the pain management clinic on September 23, 2015 and noted the injections did not provide significant relief. (Tr. 451). Physical examination showed tenderness in the lumbar spine and paraspinous musculature on the left side, positive facet loading, positive straight leg raise on the left and negative on the right, a left-sided L5-S1 sensory deficit, and normal motor strength. (*Id.*).

Dr. Jedlicka referred Mr. Brown to a spine surgeon. (Tr. 367). The surgeon, Thomas Mroz, M.D., noted physical therapy, medication management, epidural blocks, and acupuncture were ineffective. (*Id.*). On physical examination, Mr. Brown displayed full motor strength, normal sensation to light touch, symmetric reflexes, and a normal gait. (Tr. 368). Dr. Mroz ordered lumbar MRI and x-ray imaging. (Tr. 369). The MRI revealed minor disc bulging and mild posterior facet arthropathy, mild canal stenosis, and bilateral foraminal stenosis at L4-L5. (Tr. 427). At L5-S1, the MRI showed a small central left disc extrusion/herniation and a small, migrated disc fragment in the left lateral recess of L5 with displacement of the traversing left S1 nerve root and moderate spinal canal stenosis, along with superimposed minor disc bulging and posterior facet arthropathy resulting in mild bilateral foraminal stenosis. (*Id.*). On November 19, 2015, Mr. Brown returned to Dr. Mroz's office for a pre-surgery history and physical. (Tr. 392). On physical examination, Mr. Brown was able to ambulate with a heel to toe reciprocal gait without ataxia[1] or antalgia,[2] displayed

---

[1] An "ataxic" gait indicates an inconsistent, asymmetric gait with a short length and low step height. *Cerebellar Ataxia*, *Merritt's Neurology*, (13th Ed., September 2015).
[2] An "antalgic" gait indicates a shortened, limping stride resulting from pain. *Antalgic Gait*, *Stedman's Medical Dictionary* (November 2014).

7

no tenderness over palpation of the lumbar spine, and exhibited symmetric reflexes throughout the lower extremities. (*Id.*).

On December 1, 2015, Mr. Brown underwent a left L5-S1 microdiscectomy. (Tr. 442). Dr. Mroz removed encapsulated and inflamed disc fragments during the procedure. (Tr. 529). On January 21, 2016, Mr. Brown attended a post-surgical follow-up appointment with Dr. Mroz. Mr. Brown described improved, but not completely resolved, radiculopathy. (Tr. 399).

In February 2016, Mr. Brown attended the pain clinic for an office visit. (Tr. 456). He complained of continued lower back pain radiating to his left leg. (*Id.*). Physical examination revealed tenderness on palpation of the lumbar region, positive straight leg raise, positive FABER (flexion, abduction, and external rotation) signs, and normal motor strength. (*Id.*). A physician assistant prescribed a six-week course of physical therapy. (*Id.*). After completing physical therapy without significant relief, Mr. Brown returned to the pain clinic in April 2016. (Tr. 458). He continued to endorse constant left lower back pain. (*Id.*). Mr. Brown noted his medications were mildly helpful for pain control. (*Id.*). At the time, Mr. Brown was prescribed Norco, Zanaflex, Cymbalta, naproxen, and Neurontin. (*Id.*). Physical examination revealed normal findings except tenderness to the lumbar spine and positive facet loading on the left. (*Id.*).

On May 19, 2016, Mr. Brown received a medial branch block of the lumbar facet joints, which provided him with 75-80% pain reduction for two days before the pain returned. (Tr. 462, 463). In July 2016, Mr. Brown received a second medial branch block of the lumbar facet joints. (Tr. 466). Mr. Brown's pain returned within two days and he endorsed tingling and numbness in the left leg. (*Id.*). He related that walking first thing in the morning aggravated his symptoms. (*Id.*). Physical examination revealed point tenderness throughout the left-sided lumbar paraspinal

muscles, positive facet loading, positive straight leg raise on the left side, mild sensory deficits in the L5 distribution, positive FABER test with point tenderness over his left sacroiliac joint, and normal motor strength in his lower extremities. (*Id.*).

On October 12, 2016, Mr. Brown underwent a radiofrequency denervation of the lumbar facet joints. (Tr. 468). He returned for a follow-up appointment on November 8, 2016, and noted 50% relief, though he still endorsed increased pain, numbness, and tingling down his leg. (Tr. 481). Physical examination showed tenderness to palpation of the lumbar spine and paraspinous musculature, pain and diminished range of motion with flexion, extension, and rotation of the lumbar spine, mildly positive facet loading maneuvers, positive straight leg raise on the left, and decreased sensation in the left L5 dermatomes. (Tr. 482).

In November 2016, Mr. Brown returned to Dr. Mroz and noted he had been doing well for a period of time, but the left-sided back and radicular leg pain had returned. (Tr. 408). On physical examination, Mr. Brown displayed full motor strength, but with diminished reflexes in his lower extremities. (*Id.*). The straight leg raise test was negative on the right, but positive on the left. (*Id.*). Dr. Mroz sent Mr. Brown to an orthopedic surgeon R. Douglas Orr, M.D., for a second opinion. (Tr. 513).

In March 2017, Mr. Brown met with Dr. Orr and complained of recurrent low back and left buttock pain with intermittent left-sided radicular pain. (Tr. 512). Dr. Orr noted Mr. Brown's prior surgery improved his radicular symptoms but not in his back or buttock. (*Id.*). He reviewed imaging that showed a left-sided recurrent disc herniation. (*Id.*). Dr. Orr suggested another injection to see if Mr. Brown would benefit from a revision surgery. (*Id.*). Mr. Brown received a transforaminal epidural steroid injection in April 2017 and felt significant relief on the third day

post-injection lasting nearly two days, prompting Dr. Orr to suggest a revision surgery, believing it would be beneficial. (Tr. 506). On July 10, 2017, Dr. Orr performed a revision laminotomy, foraminotomy, and microdiscectomy on Mr. Brown's lumbar level. (Tr. 498). During the surgery, Dr. Orr removed moderately sized fragments of scar tissue and decompressed the lateral recess, resulting in a freely mobile nerve root. (Tr. 499).

In August 2017, Mr. Brown returned to David Harrison, PA-C, six weeks after his revision surgery, where he noted significant improvement after the second surgery until he was involved in a motor vehicle accident one week after surgery and the pain returned. (Tr. 496). PA-C Harrison found Mr. Brown had decreased range of motion in his lumbar spine due to pain and exhibited a positive straight leg raise on the left. (*Id.*). Otherwise, Mr. Brown's physical examination was normal. (*Id.*).

In October 2017, , three months after the revision surgery, Mr. Brown attended a follow-up appointment with PA-C Harrison. On physical examination, Mr. Brown displayed decreased range of motion in the lumbar spine due to pain, tenderness on palpation to paraspinal musculature, positive straight leg test on the left, and mildly diminished motor strength in the left extremities. (Tr. 495).

On May 5, 2018, Mr. Brown saw Douglas Orr, M.D., for a follow-up appointment. Mr. Brown noted the pain traveling into his left leg had improved after the revision surgery but continued to have left buttock and posterior pain. (Tr. 492).

IV.  **OTHER EVIDENCE**

In August, 2018, Mr. Brown completed an Adult Function Report. (Tr. 286-93). There, he noted that repetitive bending, lifting, twisting, lifting, and walking increase his pain and affect his

ability to work. (Tr. 286). As a result, his duties at his part-time job have changed significantly. He must take breaks often to ice or use a heating pad on his back and had to cut back to working every other day for a maximum of five hours because he requires a day to recover from a day of work. (*Id.*). His daily routine consists of getting straight into a hot shower, getting dressed, taking medications, getting his four-year-old son ready for the day (breakfast, bathing, and dressing), going to doctor's appointments, and napping or resting because of the pain and side effects of medication. (Tr. 287). His wife must help lift their son to and from the bathtub and dress him. (*Id.*).

Mr. Brown's pain disrupts his sleep. (*Id.*). He is constantly up and down, unable to get comfortable, and wakes up to pain. (*Id.*). He moves between the couch, a chair, and the bed during the night. (Tr. 293). He is prescribed a sleep aid but still cannot stay asleep for longer than three hours at a time. (*Id.*). Mr. Brown finds that putting on socks is painful, as is getting in and out of the bathtub. (Tr. 287). He must sit down to put his pants on because his balance is not great. (*Id.*). Mr. Brown has experienced bladder control issues. (*Id.*). Sometimes, he requires help getting up from the toilet if he sits too long because his legs fall asleep. (*Id.*). Mr. Brown is able to prepare simple meals using the microwave and stove but avoids using the oven because bending increases his pain. (Tr. 288). Mr. Brown pushes himself to perform household chores but must pace himself depending on his level of pain that day. (*Id.*). When he does a lot of chores, he requires a day to recover. (*Id.*). His children help with dishes, sweeping, and mowing the lawn. (*Id.*).

Mr. Brown is able to drive but only for short distances. (Tr. 289). He shops in stores, by phone, and on the computer approximately once a week for an hour or two for car parts, guitar accessories, and groceries. (*Id.*). Mr. Brown enjoys mechanics, remodeling, playing guitar, watching

television, and playing games. (Tr. 290). He plays guitar every day. (*Id.*). He rarely does mechanical work or remodeling projects anymore because those activities increase his pain. (*Id.*). When he does participate in those activities, he supervises another person doing the labor. (Tr. 290, 293).

Mr. Brown is able to spend time with others. Friends and family come over to his house, and he talks to others by phone call or text. (Tr. 290). He finds it difficult to go out to socialize and rarely has the energy to do so. (Tr. 293). Mr. Brown regularly goes to work and takes his son to and from school. (Tr. 290). If social activities involve a long drive or a lot of walking, Mr. Brown must have ice, a heating pad, and medications on hand. (Tr. 291).

Mr. Brown endorses issues with lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, completing tasks, and concentration. (*Id.*). All of these actions increase his pain. (*Id.*). Mr. Brown can walk for 10 to 15 minutes before needing to rest for about 20 minutes. (*Id.*). Mr. Brown has prescriptions for hydrocodone, duloxetine, tizanidine, mirtazapine, and meloxicam, all of which cause drowsiness and/or dizziness. (Tr. 293).

### THE ALJ'S DECISION

The ALJ's decision, dated August 28, 2019, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant was engaged in substantial gainful activity during the following periods: January 2017 through June 2017 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: spinal stenosis of the lumbar spine with neurogenic claudication; ankylosing spondylitis; somatic symptom disorder; and depression (20 CFR 404.1520(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526.

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: except he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can never climb ladders, ropes, or scaffolds. He can never work around workplace hazards such as unprotected heights or moving mechanical parts. He cannot operate bilateral foot controls. He should avoid working in conditions of extreme heat and/or cold or humidity and/or wetness. He is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work. He is limited to infrequent changes in the work setting.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on March 6, 1984 and was 31 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

9. The claimant has a at least a high school education and is able to communicate in English. (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from May 3, 2017, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 25-36).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial

evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the Court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

    4.       What is claimant's residual functional capacity and can claimant perform past relevant work?

    5.       Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Brown alleges the ALJ's written decision did not properly analyze his medical impairment in conjunction with Listing 1.04, nor did it provide articulation of the ALJ's Step Three findings sufficient to permit meaningful review. (Pl.'s Br., ECF #15, PageID 1298-99). Mr. Brown takes particular issue with the ALJ's treatment of Listing 1.04C, lumbar stenosis with pseudoclaudication. In response, the Commissioner contends the ALJ's written decision must be read as a whole and, here, the ALJ fully evaluated Mr. Brown's impairments throughout the remainder of the decision. (Comm'r's Br., ECF #18, PageID 1397). The Commissioner argues Mr. Brown cannot meet Listing 1.04A because he has not put forth evidence demonstrating positive straight leg raise testing in both the seated and supine positions. (*Id.* at 1395).

16

At Step Three of the sequential evaluation, an ALJ considers whether a claimant has a condition that is so severe as to be disabling without consideration of the claimant's age, education, and past work experience. 20 C.F.R. § 404.1520. Impairments deemed sufficiently severe as to be disabling are detailed in the Listing of Impairments, which catalogues the criteria necessary to meet or medically equal one of the listed impairments. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. At Step Three, it is the claimant's burden to introduce evidence to establish that his impairments meet or equal a listed impairment. 20 C.F.R. § 416.920(a)(4)(iii).

In the Sixth Circuit, an ALJ considering whether a claimant's impairment meets or equals a listed impairment is required to "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at step three was supported by substantial evidence." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Courts within this judicial district have applied *Reynolds* and vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful Step Three analysis that compares the medical evidence to the applicable listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing. *See Peshek ex rel. N.R. v. Comm'r of Soc. Sec.*, 2014 WL 5684386, at *13 (N.D. Ohio Nov. 4, 2014) (collecting cases). While no heightened articulation at Step Three is required, an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings. *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011). As the Commissioner correctly contends, the court may look to findings elsewhere in the ALJ's decision to support the Step Three conclusions. *See generally Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x. 359, 365-66 (6th Cir. 2014); *Bledsoe v.*

17

*Barnhart,* 165 F. App'x. 408, 411 (6th Cir. 2006). An agency's action must be upheld, if at all, on the basis articulated by the agency itself. *Teel v. Comm'r of Soc. Sec.,* No. 1:13cv755, 2013 WL 6180302, *12 (N.D. Ohio Nov. 24, 2013).

Listing 1.04 considers disorders of the spine, including, *inter alia,* herniated nucleus pulposus, spinal stenosis, and facet arthritis, resulting in compromise of the nerve root or the spinal cord. 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant meets Listing 1.04 by showing:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication,[3] established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The ALJ's treatment of Listing 1.04 is conclusory at best, offering no reasoned explanation. *In toto,* the ALJ addressed Listing 1.04 as follows:

> Furthermore, the limitations of the claimant do not satisfy the terms of Listing 1.04 for Disorders of the Spine. The claimant does not have a condition that results in the compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication established

---

[3] Pseudoclaudication, otherwise known as neurogenic claudication, refers to symptoms of leg pain (and occasionally weakness) on walking or standing, relieved by sitting or spinal flexion, related to neural compression, usually spinal stenosis. 7 Attorneys Medical Advisor § 71:3 (Sept. 2021). "Pseudoclaudication, which may result from lumbar spinal stenosis, is manifested as pain and weakness, and may impair ambulation" and the pain is provoked by extension of the spine, as in walking or standing, but is reduced by leaning forward." 20 C.F.R. Part 404, Subpart P, Appendix 1.

18

by findings on appropriate medically acceptable imaging and manifest by chronic pain and weakness.

(Tr. 26).

In my view, the ALJ's Step Three analysis did not actually evaluate the evidence, compare it to the relevant listed impairment, or give an explained conclusion. However, this only results in error requiring remand if the ALJ's findings elsewhere in the written decision do not support the Step Three conclusions.

Here, viewing the decision as a whole, the record contains significant evidence that Mr. Brown did not meet the requirement of Listing 1.04A for "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," or the requirement of Listing 1.04C to show weakness. The ALJ found Mr. Brown's physical examinations routinely showed normal muscle strength in his extremities and he almost always displayed a normal gait pattern. (Tr. 30, 31, 32, 33). The ALJ's written decision as a whole establishes that Mr. Brown's medical evidence does not meet the required elements of Listing 1.04. The ALJ's determination that Mr. Brown does not meet or medically equal the requirements of Listing 1.04 is thus supported by substantial evidence.

## Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB is supported by substantial evidence and thus recommend that the District Court **AFFIRM** that decision.

Dated: November 18, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

***ANY OBJECTIONS*** to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).